**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PAULE GREEN,

                           CASE NO. 16-10093

         *Plaintiff*,          DISTRICT JUDGE GEORGE CARAM STEEH
*v.*                         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 18)**

## I.    RECOMMENDATION

      In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Green is not disabled. Accordingly, **IT IS RECOMMENDED** that Green's Motion for Summary Judgment (Doc. 16) be **GRANTED**, that the Commissioner's Motion for Summary Judgment (Doc. 18) be **DENIED**, and that this case be **REMANDED FOR FURTHER CONSIDERATION** under sentence four of §405(g).

## II.    REPORT

### A.    Introduction and Procedural History

      Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42

U.S.C. § 1381 *et seq.*, and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 4; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 18).

Plaintiff Paule Green had twice unsuccessfully applied for benefits prior to the instant application. She appealed following her first denial, and was denied by an Administrative Law Judge ("ALJ") in September 2011. (Tr. 87). In January 2012 Green's appeal was denied by the appeals council. (Tr. 139). She applied again, and oral argument was held before ALJ Timothy Scallen in January 2013. (Tr. 30). At that hearing, Green testified, represented by attorney Dennis Little, as did vocational expert ("VE") Pauline Pegram. (Tr. 30-51). She was again denied by ALJ Scallen in March 2013. (Tr. 116). In May 2014 the appeals council granted Green's request that the case be remanded to the ALJ for further proceedings. (Tr. 134). Specifically, the appeals council found that the ALJ did not properly evaluate Green's mental health, and applied an RFC standard in her decision which did not reflect the questions asked of the VE at the hearing. (Tr. 136). ALJ Scallen held a second oral hearing in December 2014 at which Green again testified, represented by Dennis Little; VE Helen Topcik also testified. (Tr. 52-74). The ALJ then issued the instant decision in January 2015, finding that Green was not disabled. (Tr. 13). In November 2015 the appeals council denied review. (Tr. 1). Green filed for judicial review of that final decision on January 12, 2016. (Doc. 1).

2

**B.     Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

3

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

4

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Green not disabled under the Act. (Tr. 24). The ALJ found at Step One that Green had not engaged in substantial gainful activity following the alleged onset date, May 31, 2008. (Tr. 18). At Step Two, the ALJ concluded that Green had the following severe impairments: "degenerative disc disease; anxiety; and depression" (Tr. 18). At Step Three, the ALJ found that Green's combination of impairments did not meet or equal one of the listed impairments. (Tr. 19-20). The ALJ then found that Green had the residual functional capacity ("RFC") to perform sedentary work, except with the following additional limitations:

> Lift and carry and push and pull 15 pounds frequently; stand for one to two hours at a time; walk limited two blocks; and sit for the remainder of an eight hour day, with a sit stand option. She cannot climb ladders, ropes or scaffolds; cannot squat or arise from squatting; can occasionally climb stairs; and has no manipulative limitations. She cannot be exposed to hazards or hazardous machinery. The claimant has concentration, persistence or pace deficits, but can perform unskilled tasks, meaning simple, routine repetitive tasks and can perform simple job assignments. She can perform high production assignments or goal oriented, rather than production rate pace work. She can perform detailed or complex assignments, but requires a low stress environment defined as requiring only occasional work related decision making and having only occasional changes in the work setting. The claimant also has social functioning deficits, but can perform jobs with no interaction with [the] general public, occasional interaction with co-workers, but can frequently work primarily alone, with only occasional supervision and can perform frequent work with things rather than people.

(Tr. 20-23). At Step Four, the ALJ found that Green could not return to any past relevant work. (Tr. 23). At Step Five, the ALJ concluded that Green retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 23-24).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has thoroughly reviewed Green's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### a.   Third Party Function Report

Green apparently did not complete a function report, as one does not appear in the record. However, in Mach 2012 Green's daughter, Rahquel completed a third-party function report. (Tr. 275). Rahquel wrote that she took care of her mother "all day." (*Id.*). She wrote that Green did not perform personal care adequately, did not speak to others frequently, sometimes got "angry and aggressive," and did not cook or clean. (*Id.*). She wrote that Green generally slept and watched television during the day. (Tr. 276). Green had to be reminded to perform personal care activities. (*Id.*). Rahquel did not trust her mother with medicine. (Tr. 277). Green did not perform any chores. (*Id.*). She attended only doctor appointments and therapy. (Tr. 278). Green could not drive, did not shop, and could not pay bills, handle a savings account, or use a checkbook. (Tr. 278). Green had no hobbies except watching television, and did that activity "not often." (Tr. 279). She

engaged in no social activities beyond weekly group therapy. (*Id.*). She got "angry all the time," and did not trust others. (Tr. 280). Rahquel wrote that Green had difficulty performing all listed activities, including lifting, seeing, and getting along with others. (*Id.*). She could walk only twenty steps, stand for only five minutes, could not bend or squat, could lift only five pounds, had blurred vision, limited memory, and limited concentration. (*Id.*). She could pay attention for three to five minutes. (*Id.*). She could not or would not follow instructions. (*Id.*). Rahquel reported that Green experienced dizziness, confusion, drowsiness, and diarrhea as medication side effects. (Tr. 282).

### b.   Green's Testimony at the 2013 Administrative Hearing

At the January 24, 2013, hearing, Green testified that her pain had worsened since September 1, 2011, the date of the prior ALJ's decision. (Tr. 33-34). She complained of arthritic pain rated at a nine out of ten. (Tr. 35). She took Vicodin to reduce this pain. (*Id.*). She also underwent pain relieving injections to the back, but the relieving effect lasted only a few weeks. (*Id.*). She complained of nausea and exhaustion from her use of Vicodin. (Tr. 36). She experienced shooting pain down her right leg which sometimes caused her to stumble. (*Id.*). However, she did not use a cane because she "stay[s] in a lot." (*Id.*).

As to developments in her mental health, Green asserted that she was taking Valium three times daily, along with Effexor XR. (Tr. 37). She reported that those medications caused drowsiness, and that she was irritable both with and without the medication. (*Id.*). Green asserted that she experienced panic attacks daily due to "fear and

8

stress." (Tr. 38). Green had "good" familial support, and also had support from a friend who "helps out every now and then with . . . hygiene," including purchasing lotion, deodorant, and other hygiene supplies. (Tr. 40-41).

Green testified that she did "have any television or nothing," and spent her days "just sit[ting] in [her] room . . . just look[ing] at a paper or something." (Tr. 41). She also spent time "play[ing] with [her] grandbaby." (Tr. 42). Green then asserted that she also spends time "look[ing] at the TV," and enjoyed watching the television channels TMZ and CNN. (Tr. 41-42). However, she did not "have any cable," and thus was limited to watching programs available over the air. (*Id*.). She frequently napped during the day. (Tr. 42-43).

Green asserted that she could not pay attention for any significant length of time, could sit for only about thirty minutes, stand for ten minutes, lift about five pounds, and could walk the distance of perhaps "three or four houses or something." (Tr. 44).

### c.   The VE's Testimony at the 2013 Administrative Hearing

The ALJ then called upon the services of a VE to determine Green's ability to perform work. (Tr. 45). The ALJ asked several questions regarding Green's past work (Tr. 45-48), but these questions are not relevant as the ALJ found that Green was unable to perform any past work, and thus based his unfavorable decision on Green's ability to complete other work available in the national economy (Tr. 23).

The ALJ asked the VE to assume a hypothetical individual with Green's age, education, and work experience, and who could perform sedentary work with the following additional limitations:

> [C]an carry lift up to 15 pounds. Also, limited to occasional climbing of stairs and ramps, no climbing of ropes, ladders, and scaffolds, sit, stand option. Also, limited to no squatting, avoid moving machinery. Furthermore, limited to simple routine repetitive tasks, low stress, involving occasional changes, can do high production rate assignments. Also, limit to no interaction with the public, and occasional interaction with the coworkers. .

(Tr. 49). The VE found that such a person could not perform any of Green's past work, but could work as a hand packager, hand assembler, visual inspector, or sorter. (Tr. 49). That category of positions boasted 10,000 jobs in Michigan. (*Id.*). The VE confirmed that a worker who was off task more than twenty percent of the time, or was absent more than one day per month on a recurring basis, would be unable to maintain competitive employment. (Tr. 50).

### d. Green's Testimony at the 2014 Administrative Hearing

In 2014 ALJ Scallen held a second oral hearing following remand by the appeals council. (Tr. 54). Green reported that her conditions had worsened since the prior hearing, particularly in terms of back pain, and leg pain. (Tr. 56). Her pain was a "ten" on a ten scale despite the use of the pain reliever Norco. (*Id.*). She reported leg pain resulting from the removal of a bone spur on her foot, and asserted that her recovery period was expected to take between six and nine months (Tr. 58). She used a cane "more now" due to her surgery. (*Id.*). She also used a walker at home "[s]ince the surgery." (Tr. 64).

10

Green asserted that she continued to suffer from numbness and shooting pain throughout her back and lower right extremity, up to two or three times daily. (Tr. 59). She slept for a few hours during the day, and a few more at night. (Tr. 60-61). Green later testified that she slept "maybe 17 hours per day." (Tr. 66). She also reported continuing numbness in her arms. (Tr. 61).

As to mental health, Green asserted that she experienced panic attacks four times daily, resulting in shortness of breath, increased heart rate, faintness, and difficulty breathing. (Tr. 62-63). Her attacks could last for up to six hours, "off and on." (Tr. 63). Green stated that she lived with "a close friend of the family" who prepared her meals; when she cooked, she often burned food due to forgetfulness. (Tr. 64). She asserted that she did not trust "anybody," and did not have any friends beyond her housemate. (Tr. 65).

When asked whether she watched television, Green said "[n]ot really but, yeah, I do but I'm asleep." (Tr. 67). However, she had difficulty concentrating on television programs and often fell asleep due to her medication. (*Id*.).

### e.      The VE's Testimony at the 2014 Administrative Hearing

The ALJ then once again called upon the services of a VE to determine Green's ability to perform work. (Tr. 69). The ALJ asked several questions regarding Green's past work, none of which are relevant to this appeal because the ALJ did not base his decision on Green's ability to return to her past work. (Tr. 69-70).

The ALJ asked the VE to assume a hypothetical individual with Green's age, education, and work experience, and who could perform sedentary work with the following additional limitations:

> [C]an lift and carry and push and pull 15 pounds frequently. Stand for one to two hours at a time, walk limited two blocks, sit for the remainder of an eight-hour day with sit/stand option . . . she cannot climb ladders, ropes and scaffolds, cannot squat or arise from squatting, can occasionally climb stairs and has no manipulative limitations. She cannot be exposed to hazards or hazardous machinery, the defendant has no concentration, persistence or pace deficits but can perform unskilled tasks meaning simple, routine, repetitive tasks and can perform simple job assignments. She can perform high production assignments or goal oriented rather than production rate paced work. She can perform detailed or complex assignments but requires a low stress environment defined as requiring only occasionally work [sic] related decision making and having only occasional changes in work . . . setting . . . . The claimant also has social functioning deficits but can perform jobs with no interaction with the general public, occasional interaction with coworkers but can frequently work primarily alone with only occasional supervision and can perform frequent work with things rather than people.

(Tr. 70-71). The VE found that such a person could not perform any of Green's past work. (Tr. 71). However, the hypothetical worker would be able to perform work as a table worker (200,000 jobs nationally), addressing clerk (100,000 jobs), and final assembler (100,000 jobs). (Tr. 72).

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but the person would also be permitted to sit or stand at will. (Tr. 72). The VE found that this additional limitation would not affect the availability of jobs previously identified. (*Id*.).

12

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

404.1527(c)(2). *See also Green v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the treating
> source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For

example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995)

(unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the

record and factors outlined in Social Security Ruling 96-7p. Credibility determinations

regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of

Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r

of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Green

v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

16

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.     Analysis

Green argues that the ALJ erred in several ways, each of which should merit remand. (Doc. 16). These arguments will be addressed in turn.

### 1.     Res Judicata Effect of Prior Decisions

While the parties do not discuss the preclusive effect of the prior decisions in this matter at length, I find that a discussion of that issue would be helpful to understanding the procedural posture of this case. The ALJ's decision rendered in September 2011 (Tr.

17

87) became the final decision of the Commissioner (Tr. 139), and is thus entitled to preclusive effect. *See generally Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997). An earlier ALJ's decision is presumptively preclusive not only of the period actually adjudicated in that decision, but also stretches out into the future, and is preclusive of the unadjudicated period going forward. "Evidence of 'changed circumstances' after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision." *Honorable v. Comm'r of Soc. Sec.*, No. 215CV10190MFLPTM, 2015 WL 9469985, at *8 (E.D. Mich. Nov. 19, 2015), report and recommendation adopted, No. 15-CV-10190, 2015 WL 9459916 (E.D. Mich. Dec. 28, 2015). Therefore, where an ALJ is presented with a new claim for disability following a prior denial, the ALJ must consider whether the claimant has presented "new and material" evidence that his or her health has declined since the prior decision. If the claimant fails to provide such evidence, the ALJ should conclude that the prior decision continues to have preclusive effect over the unadjudicated period, and thus end the decision.

In this case, the ALJ noted in his 2013 decision the preclusive effect of the 2011 decision, and properly concluded that the prior decision was conclusive as to Green's non-disability between May 2008 and September 2011, the dates "adjudicated in the previous decision." (Tr. 120). The ALJ further concluded that "there has been no new and material evidence relating to the previous findings, nor has there been any change in the law, regulations, or rulings affecting the finding or the method for arriving at the

18

finding." (*Id*.). The ALJ thus appeared to conclude that nothing had affected the validity of the result reached in the prior decision with regard to Green's disability between 2008 and 2011.

However, the ALJ's next step was to determine whether Green had presented new and material evidence of deterioration in her condition post-2011. *See Drummond*, 126 F.3d at 843. Instead, the ALJ seemed to believe that he was free to review *de novo* the unadjudicated period, absent any comparison between the adjudicated period and unadjudicated period to determine whether new and material evidence of deterioration had been produced.

Later in his decision, the ALJ asserts that "[t]he additional evidence of record showing treatment for physical conditions does not establish new and material evidence." (Tr. 22). Therefore, the ALJ should have thus concluded that the 2011 decision was preclusive over the post-2011 period, and that he was without authority to make findings that differed from the 2011 decision. *See Clayton v. Comm'r of Soc. Sec.*, No. 2:15-CV-12249, 2016 WL 5402963, at *2 (E.D. Mich. Sept. 28, 2016) ("[I]n order for an ALJ to make findings that differ from a previous decision, a claimant must provide new and material evidence demonstrating changed circumstances . . . .").

Where an ALJ in a subsequent decision renders an RFC finding which is more restrictive than the ALJ in a prior decision, the claimant has no cause for remand even if the subsequent ALJ failed to properly apply the preclusive effect of the earlier decision, because any error inures to the claimant's benefit. *See Clayton*, 2016 WL 5402963, at *3

19

(E.D. Mich. Sept. 28, 2016); *Kepke v. Comm'r of Soc. Sec.*, No. 13-13944, 2015 WL 348747, at *16 (E.D. Mich. Jan. 23, 2015), aff'd, 636 F. App'x 625 (6th Cir. 2016). Error in that case would be harmless. On the other hand, in cases like *Drummond*, where the ALJ concludes that the claimant has greater capabilities in the latter decision than in the prior decision, the ALJ point to new and material evidence justify departing from the prior decision, or risk reversal.

This case is unusual in that it is unlike both *Drummond* and *Clayton*. The ALJ's 2015 RFC in this case is neither stricter nor looser than the ALJ's decision in 2011. Instead, the ALJ in this matter simply replicated and "fully adopted" the same RFC issued in 2011. (Tr. 20, 22, 81). The ALJ could (and indeed should) have concluded his decision upon finding that there was not new and material evidence justifying a departure from the 2011 decision. Yet Green has not been harmed by the ALJ's repetitive analysis in this case, because he reached the same RFC finding as the 2011 decision, and thus did not subject Green to a higher standard of review. Had the ALJ faithfully applied the *res judicata* standards, she would have been found not disabled pursuant to the decision of the ALJ in 2011. Therefore, the ALJ's apparently *de novo* review of Green's credibility and medical records cannot have caused her any prejudice. While the ALJ appears to have inconsistent and incompletely applied the *res judicata* standard in this case, no cause for remand is apparent in the ALJ's error.

Green also argues in an undeveloped, single-sentence fashion, that the ALJ erred by finding that Green could perform "sedentary work," which is defined as lifting no

20

more than ten pounds at a time, but could lift up to fifteen pounds frequently. (Doc. 16 at

16). "It is well-established that 'issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.'" *Rice v.*

*Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (quoting *United States v.*

*Layne*, 192 F.3d 556, 566 (6th Cir. 1999)). Green's failure to develop this argument in a

more than "skeletal way," leaving it for the Court to "put flesh on its bones," merits

waiver. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) (quoting

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

The ALJ's reference to "sedentary" work is nothing more than a shorthand

reference to a statutory definition which provides as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small
> tools. Although a sedentary job is defined as one which involves sitting, a
> certain amount of walking and standing is often necessary in carrying out
> job duties. Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). In the oral hearing, the ALJ asked the

VE whether a hypothetical claimant limited to "sedentary work as defined in 416.967,

except that she can lift and carry and push and pull 15 pounds frequently" could perform

work available in the national economy. (Tr. 70). The ALJ thus referenced the statutory

definition of "sedentary work" as shorthand, but modified the definition to include a

higher lifting, pushing, carrying, pushing, and pulling capacity. Despite applying this

more-strenuous-than-sedentary set of conditions, the VE found that someone limited as

21

described in the ALJ's hypothetical could work in several positions available in substantial numbers in the national economy. (Tr. 70-73). No error can be found here.

### 2. The ALJ's Credibility Determination is Supported by Substantial Evidence

Finally, Green argues that the ALJ rendered an erroneous credibility determination, ignoring the strictures imposed by SSR 96-7p and 20 C.F.R. § 416.929. (Doc. 16 at 20). Green also accuses the ALJ of rendering a "boilerplate" credibility determination without providing substantial reasons for discounting her credibility. (*Id*. at 20-21). Green is correct that, under SSR 96-7p, the ALJ was required to consider "the intensity, persistence, and functionally limiting effects of the symptoms" resulting from medically determinable physical or mental impairments in light of "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." As to pain, the ALJ was required to consider the factors listed in 20 C.F.R. § 4404.1229(c)(3) and 20 C.F.R. 416.929(c)(3) above, including Green's daily activities and measures used to relieve pain.

Review of the ALJ's decision demonstrates that he sufficiently considered Green's statements and the medical evidence of record in a manner consistent with his statutory obligations. The ALJ found no evidence confirming "the physical limitations and pain levels that the claimant alleged," including "no mention of ten out of ten back pain" or

"the claimant's need to sleep throughout most of the day" in the record. (Tr. 22). He also noted "very little treatment since March 22, 2013 and . . . nothing to support the extreme symptoms alleged," along with "much less pain levels [sic]," and "stable mental health symptoms without medication side effects." (*Id*). In the 2013 decision (which was incorporated by reference), the ALJ noted Green's "generally unpersuasive appearance and demeanor while testifying at the hearing," and the "relatively weak medical evidence." (Tr. 126-28).

Unfortunately, rather than addressing the ALJ's credibility findings and providing reasons to discount them, Green simply ignores them. Instead, she asserts that the ALJ's credibility determination was composed entirely of a finding that "the Plaintiff's subjective complaints are 'exaggerated' and not supported by the evidence." (Doc. 16 at 22) (quoting Tr. 23). Green has apparently opted to focus on the standard language regarding credibility, which appears in nearly every ALJ decision, while simply ignoring the factors which support that conclusion. Green has totally ignored the justifications provided by the ALJ in support of his credibility finding and provided no argument opposing those findings. In so doing, she has effectively presented a skeletal argument, devoid of specific argumentation, and requested that the Court generate an argument on her behalf. She is not entitled to rely on the Court as her advocate, and thus any argument she may have raised on the issue of credibility is waived. *See Rice*, 169 F. App'x at 454.

In any case, the ALJ clearly addressed each of the factors listed in 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3) (*see* Tr. 21-22, 126-28), and addressed Green's

23

statements and the medical evidence as required by SSR 96-7p (Tr. 19-23, 125-28). No error can be found here.

### 3. The ALJ's RFC Does Not Properly Account for Green's Supportable Mental Limitations

Green next argues that the ALJ erred by crafting an RFC which did not adequately encompass the breadth of her mental limitations.[1] (Doc. 16 at 15). Green argues that she does not retain the capacity to perform "unskilled work as well as complex assignments." (*Id.* at 16). She references medical records which demonstrate a global assessment functioning ("GAF") score of 46[2], the use of Xanax, along with recurrent panic and anxiety attacks. (*Id.*). In January 2011 a state consultative examiner found that Green's mental issues may "interfere with her ability to maintain standards of behavior and safety." (Doc. 16 at 16; Tr. 544).

She also notes that in February 2012 she was "partial[ly] hospitali[zed] suicidal ideation along with panic, depression, crying, anger problems, and hallucinations. (Doc.

---

[1] While Green's motion for summary judgment makes a brief mention of her physical health (Doc. 16 at 2, 7-9), she makes no substantial argument that the ALJ failed to incorporate any physical limitation into his RFC finding. Any argument she might have raised has been thereby waived. As properly noted by the ALJ, Green's medical record demonstrates little evidence of physical limitation (Tr. 22), and whatever physical limitations Green might suffer from are handily compensated for by the ALJ's RFC. No further discussion of Green's physical limitations is necessary. Green argues in her reply brief that the ALJ improperly failed to discuss her activities of daily living, her treatment at Lincoln Behavioral Services, and several physical examinations. (Doc. 19 at 5). Green cannot save an argument for the reply brief, because doing so deprives the Commissioner of an opportunity to respond. In doing so, she has again waived that argument. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is waived."). Regardless, Green's medical record is light on evidence regarding physical limitations, and even a properly developed argument regarding her alleged physical impairments would fail to persuade.

[2] A GAF score of 41 to 50 indicates '[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. Diagnostic and Statistical Manual of Mental Disorders—Text Revision ("DSM–IV–TR"), 34 (4th ed. 2000).

16 at 17; Tr. 393-94). Following discharge, she did not again seek psychiatric treatment for five months, in July 2012. (Doc. 16 at 17; Tr. 500-539). She again treated for panic disorder, depressive disorder, and psychotic symptoms, and again expressed suicidal and homicidal ideation (Tr. 501, 529). She attended therapy three times monthly, had individual therapy bi-monthly, and a medication review monthly. (Doc. 16 at 17; Tr. 503). Treating psychiatrist Dr. Sean Prystash concluded in December 2012 that Green was "unable to meet competitive standards" in the way of remembering work-like procedures; understanding and remembering short and simple instructions; maintaining attention for two hours at a time; maintaining regular attendance; sustaining an ordinary routine; working in coordination with others; making simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace; asking simple questions; accepting instructions and criticism from supervisors; getting along with coworkers without exhibiting behavioral extremes; responding appropriately to changes in routine work setting; dealing with normal work stress; and being aware of normal hazards. (Doc. 16 at 20; Tr. 549). He also concluded that Green would be absent from work for at least four days monthly. (Doc. 16 at 20; Tr. 550).

In November 2013 Green was hospitalized after asserting that she wished to commit suicide; a GAF score of 15[3] was assessed. (Doc. 16 at 18; Tr. 561-62). Later that

---

[3] A GAF score of eleven to twenty indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain

month she was again hospitalized with severe depression. (Doc. 16 at 18; Tr. 551-56). Between September 2013 and March 2014 Green was found to have a GAF score of 40[4], and continued to experience panic and depression. (Doc. 16 at 18-19; Tr. 565-620). Diagnoses of bipolar disorder, post-traumatic stress disorder, impulse control disorder, and personality disorder persisted through April 2014 and October 2014. (Doc. 16 at 19; Tr. 621-666).

In his 2015 decision, the ALJ concluded that Green's mental health had not significantly changed since the date of his 2013 decision, and thus incorporated in full the assessment of her mental health rendered in that earlier decision. (Tr. 22). While it is true that Green's admission to the hospital for suicidal ideation in November 2013 was not unprecedented in her medical record, this fact does not undercut the severity of her symptom.

The ALJ was required to give "good reasons" for providing less-than-controlling weight to Green's treating physicians' opinions. 20 C.F.R. § 404.1527(c)(2). The ALJ gave less weight to Dr. Prystash's opinion, finding that his "fair" prognosis was inconsistent with his otherwise dire prognosis. (Tr. 127). This reasoning provides weak support for the ALJ's conclusion. It would strain credulity to interpret a single-word prognosis of "fair" as negating a physician's other medical findings. If indeed Dr.

---

minimal personal hygiene or gross impairment in communication (e.g., largely incoherent or mute). *See* DSM-IV-TR at 32.

[4]  A GAF score of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV-TR at 34.

Prystash intended for his "fair" prognosis to mean that Green was doing "fairly well overall," one would expect the remainder of his opinion to confirm this finding. Instead, the remainder of his opinion paints a dire picture of Green's mental health, indicating that she would be unable to meet competitive standards in nearly all areas of mental functioning. (Tr. 549-50). A "fair" prognosis is simply too vague to merit discounting Dr. Prystash's opinion for this reason alone. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013) ("[T]he fact that Dr. Shahzaad noted fair ability in most areas does not qualify as a good reason for discounting his opinion.").

The ALJ provided other, more substantial reasons justifying the weight assigned to Dr. Prystash's opinion. He also noted that the physician's opinion was "conclusory in nature, with minimal explanation of the objective or clinical findings in support of the assessment, rendering it less persuasive." (Tr. 127).

It is well settled that a check-the-box form, unaccompanied by explanation, is entitled to little or no weight, because "it is nearly impossible to analyze" the justification for the checked boxes. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records.").

While Dr. Prystash provides some description of Green's condition, it offers limited insight into the nature of his checked boxes. For instance, when assessing Green's response to treatment, he asserted that Green "has flat affect + speak very [illegible] in

27

t[reatment] sessions." (Tr. 547). He also notes clinical findings supporting his opinion, including, "h[istory] of panic attacks, depression, that immobilizes her. Anxiety with panic + fleeting thoughts of suicide + difficult time falling asleep . . . states she sees shadows + voices at times, states feeling of paranoia + [illegible.]" (Tr. 547). These brief notations provide some context for Dr. Prystash's findings, but cannot support the full extent of his extreme check-the-box findings.

In her reply brief, Green asserts that Dr. Prystash's opinion is well-supported when one compares his treatment notes to his opinion. (Doc. 19 at 2). She does not specifically reference records which might support Dr. Prystash's opinion, but instead relies upon the Court to scour the record on her behalf. While Green's limited argument could reasonably merit a finding of waiver, the Court finds it proper to review Green's medical records to determine whether the ALJ's characterization of her mental health is supported by substantial evidence. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that the doctrine of waiver "is prudential and not jurisdictional").

In October 2013 Green stated that she "continu[ed] to experience frequent [audio visual hallucinations] including hearing voices of deceased family members and seeing shadows." (Tr. 594). Dr. Prystash assessed a GAF score of 55[5]. (Tr. 597). In December 2013, Green told an unknown physician (possibly Dr. Prystash) that her days were composed of little more than watching television and sleeping; she wished to get better,

---

[5] A GAF score of 51 to 60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *See* DSM–IV–TR at 34.

28

and wanted to work, but found that she was unable to work around others. (Tr. 579).      In January 2014 Green was hospitalized after "running out of her meds, was having hallucinations, depression and panic attacks." (Tr. 575). She reported that use of Xanax helped her anxiety; she was discharged with a prescription for the same. She reported some audiovisual hallucinations. (*Id*.).

In February 2014 Green reported frequent bouts of anger, but also reported changing her medication regimen without consulting her physician. (Tr. 569). She had fleeting thoughts of hurting others, but was "able to not act on that." (*Id*.). In March 2014 Green continued to "struggle with depression and panic attacks," "continues to struggle with anger and 'lashes out.'" (Tr. 566). She had a GAF score of 40. (*Id*.). While these findings are by no means insignificant, they are arguably insufficient to support many of the conclusions in Dr. Prystash's check-the-box form, including his findings that Green could not carry out "very short and simple instructions," "remember work-like procedures," or "maintain regular attendance and be punctual" at a level necessary to meet competitive standards. (Tr. 549). Unfortunately, Dr. Prystash opted not to complete sections asking that he "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment" (Tr. 549), thus the reader is left to guess as to how these findings link up with Dr. Prystash's clinical notes.

While Dr. Prystash's notes are not sufficient to fully to justify the limitations listed in his opinion, his opinion's supportability should be tested against the remainder of the medical evidence as well. *See* 20 C.F.R. § 404.1527(d)(2).

In September 2013 Green reported increased symptoms of anxiety and depression along with "fleeting suicidal . . . ideation, panic attacks, auditory, tactile and visual hallucinations, paranoia, disturbed sleep and appetite." (Tr. 619).

In November 2013 Green reported hearing voices on a "frequent" basis, and suffered from elevated anxiety and panic attacks. (Tr. 594).

In December 2013 Green was admitted to the hospital on the request of her therapist due to hopelessness, depression, and suicidal ideation. (Tr. 563). Green experienced mood swings, could not concentration, and could not sleep. (*Id*.). She was discharged several days later with a GAF score of 50. (Tr. 564). That month, Green told a physician, consistent with her testimony before the ALJ, that she spent her days watching television and sleeping intermittently. (Tr. 579). She complained of difficulty maintaining attention, and wished to return to a normal life of working, earning money, and "taking care of [her] family." (*Id*.).

In January 2014 Green was "hospitalized after running out of all of her meds, was having hallucinations, depression and panic attacks." (Tr. 578). Xanax "significantly" helped with panic attacks and anxiety, but she was "still experiencing intermittent" audio visual hallucinations. (Tr. 575).

In February 2014 Green "continue[d] to be angry a lot and may have fleeting thoughts of hurting others . . . however she is able to not act on that." (Tr. 569).

In March 2014 Green reported "progress in mental health," but nevertheless sometimes experienced hallucinations, had panic attacks, and poor sleep. (Tr. 567). Her GAF score was rated at 55. (Tr. 571).

In April 2014 Green presented as "Depressed and slightly anxious." (Tr. 647). She experienced sleep disturbances, and was "under a lot of stress right now and that trigger[ed] her anxiety and panic attacks." (*Id*.). She had "trouble sitting in the assessment and stated she wants to get back home. Client reports having trouble focusing on reading. Client stated she never finishes anything she starts." (Tr. 649). Green reported hearing and seeing "her fathers [sic] spirit," and sometimes felt "like someone is sitting on her bed when she's laying down." (*Id*.). Green experienced some paranoia and did not "like to sit around people she doesn't know." (*Id*.). She had difficulty sleeping, cooking, cleaning, watching television, and being in the company of others. (Tr. 650). She was a "low" risk to herself and others. (Tr. 652). Her GAF score was assessed at 45. (Tr. 663).

In June 2014 Green again complained of repeat "fleeting auditory and visual hallucinations." (Tr. 631). Also that month, Green was found to be distractible, the content of her thought showed "considerable anxiety, depression, anger and agitation. She [was] also impulsive." (Tr. 634). Her thought process was "tangential and circumstantial." (*Id*.). She was assessed a GAF score of 45. (Tr. 635).

31

In November 2014 Green was found to suffer from delusions, including shadows and "command hallucinations." (Tr. 561). She was admitted to the hospital pursuant to suicidal ideation. (*Id*.). Her GAF score was rated at 15. (Tr. 562).

Comparing these treatment notes to Dr. Prystash's opinion renders that physician's assessment more plausible. Dr. Prystash's GAF rating of 50 is not excessively low, and indeed falls on the higher side of Green's overall set of GAF ratings. (Tr. 547). Secondly, the medical record clearly supports a finding that Green experienced hallucinations, paranoia, panic, depression, and anger throughout her post-2013 medical record. In this light, Dr. Prystash's opinion that Green could not carry out short and simple instructions, remember work procedures, maintain attendance, and so forth appear consistent with the other evidence of record.

Ultimately, it is difficult imagine that a claimant suffering from depression and panic unto suicidal ideation meriting hospitalization could work in any competitive employment position. This is particularly evident where even use of appropriate medication was not able to prevent Green's bouts of suicidal thought, and where even the state agency consultative psychologist concluded that Green's "mental health issues and medical problems may interfere with her ability to maintain standards of behavior and safety issues." (Tr. 544). Distressingly, the ALJ makes no mention of Green's hospitalization pursuant to suicidal ideation in November 2013 or November 2014, and instead concludes that "there have been no significant changes in her condition since March 22, 2013. (Tr. 22). Despite the ALJ's attempt to characterize it as such, Green

cannot be found to have experienced "stable mental health symptoms" (Tr. 22) at any point in the post-2011 record. This failure merits remand, and the ALJ should reconsider Green's mental health in light of these more recent medical records on remand. *See Lopez v. Astrue*, No. 10 CV 6515, 2012 WL 426899, at *9 (N.D. Ill. Feb. 10, 2012) ("[The ALJ] did not explain how the RFC accommodates Lopez's PTSD or accounts for her random suicidal ideation and hallucinations. That lack of analysis casts doubt on whether the ALJ's determination that her depression is not disabling is supported by substantial evidence.").

### 4.    The ALJ's RFC is Fatally Unclear Regarding Green's Concentration, Persistence, or Pace Limitations

There is another potential problem with the ALJ's finding. While Green does not discuss it, the ALJ's RFC finding appears to be potentially self-contradictory. He limits Green to the performance of "simple, routine, repetitive tasks," but also asserts that she "can perform detailed or complex assignments." (Tr. 20). In so doing, the ALJ effectively limits Green to a narrowed band of work, then re-expands it to the full range of task complexity. This accommodation is therefore no accommodation at all.

Likewise, as to pace, the ALJ writes that Green can complete "high production assignments or goal oriented, rather than production rate pace work." (Tr. 20). It is again unclear precisely what the ALJ meant by this restriction, if it can be called a restriction at all. The Court is unaware of any meaningful distinction between "high production assignments" and "production rate pace work." Indeed, these terms have been used in at

33

least one case as synonyms. *See Sisson v. Colvin*, No. 5:15 CV 0552, 2016 WL 3360509, at *3 (N.D. Ohio June 14, 2016) (distinguishing between "high production quotas or tasks at a production rate pace" on one side and "goal oriented work" on the other). Given this apparent contradiction (or at minimum, confusion) in terms, I cannot find that the ALJ's questions to the VE produced substantial evidence upon which the ALJ could rely. *See McCoy v. Comm'r of Soc. Sec.*, No. 3:15-CV-02308, 2016 WL 6565559, at *15 (N.D. Ohio Nov. 4, 2016) ("[S]ubstantial evidence does not support an ALJ's decision to deny disability benefits where the VE's testimony is unclear."); *Zerby v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV1405, 2014 WL 3956778, at *6 (N.D. Ohio Aug. 13, 2014) (same). The ALJ's decision is therefore not supported by substantial evidence for this additional reason. On remand, the ALJ should present to the VE a consistent, comprehensible hypothetical question, which properly accounts for all of Green's supportable limitations.

In sum, while the ALJ appears to have erred in applying the preclusive effect of the Commissioner's 2011 decision, Green suffered no prejudice, and the error presents no cause for remand. Likewise, the ALJ properly evaluated Green's credibility. However, the ALJ's decision is not supported by substantial evidence because the reasons he gave for discounting Dr. Prystash's opinion are unconvincing, and he consequently drafted an RFC finding which insufficiently compensates for Green's supportable mental limitations. The ALJ also erred by posing a hypothetical question to the VE which is self-contradictory (or, at a minimum, fatally unclear); the ALJ's questions to the VE did not produce substantial evidence upon which the ALJ could rely. Because the ALJ's decision

34

is fatally flawed, it should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Green's Motion for Summary Judgment (Doc. 16) be **GRANTED**, the Commissioner's Motion (Doc. 18) be **DENIED**, and that this case be **REMANDED FOR FURTHER CONSIDERATION under sentence four of §405(g)**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Green v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 21, 2016                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 21, 2016                    By s/Kristen Castaneda
                                            Case Manager

36